### MONARCH CEMENT COMPANY,
### Plaintiff,

### v.

### UNITED STATES of America,
### Defendant.

### Civ. A. No. 76–185–C6.

United States District Court,
D. Kansas.

July 13, 1978.

Richard Jones of Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiff.

E. Edward Johnson, former U. S. Atty., Benjamin L. Burgess, Jr., former Asst. U. S. Atty., Wichita, Kan., and Robert Livingston, Dept. of Justice, Tax Division, Washington, D. C., for defendant.

## MEMORANDUM OF OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WESLEY E. BROWN, District Judge.

In this action, tried to the Court, plaintiff seeks a refund of federal income taxes and interest paid, arising from the defendant's disallowance of deductions claimed by plaintiff on its 1968, 1969, 1970 and 1971 federal income tax returns.

The action arises out of a 1956 loan transaction, in which plaintiff borrowed $6,250,000.00 from the Northwestern Mutual Life Insurance Company. As a part of the transaction, Northwestern received warrants to purchase plaintiff's stock at a specified price within a specified time. In 1962, plaintiff purchased the warrants from Northwestern for the sum of $650,000 and deducted this cost as interest on subsequent federal tax returns. As noted, the Internal Revenue Service disallowed the deductions and plaintiff paid the additional tax demanded, with interest.

After due consideration of the stipulations of the parties, the testimony of witnesses and examination of exhibits and depositions admitted in evidence, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. In November, 1955, plaintiff, a publicly held Kansas corporation, determined that it needed approximately $6,250,000 additional capital for plant expansion and improvements. That amount was near or in excess of plaintiff's then book net worth. (Ex. 8; Loud deposition, p. 17).

Plaintiff unsuccessfully attempted to arrange the necessary financing on its own.

2. Plaintiff then contracted with F. Eberstadt & Company, a New York brokerage firm, to attempt to place $4,500,000.00 fifteen year 4¼ to 4½% debentures, and $1,500,000.00 5¼ to 5½% preferred stock. (Exhibit 1).

3. The combined debenture-preferred stock arrangement would have resulted in a net interest cost to plaintiff in excess of 5% by reason of the non-deductability of the preferred stock dividends (paid out of after-tax earnings). At all times, plaintiff was a profitable company, with its net earnings exceeding amounts required to pay preferred stock dividends. (Exhibits 7, 8, A, B, & C).

4. Eberstadt was unable to market the note and preferred stock package. The proposal was offered to Allstate Insurance Company, which declined the offer.

5. Eberstadt then attempted to obtain full financing of the debt by use of what is known in the trade as an "equity kicker", that is, an arrangement for participation in the equity of the corporation so that a lendor may share in the prospective growth of the value of the common stock of a corporation.

Under this arrangement, Eberstadt was able to obtain a commitment from Northwestern Mutual Life Insurance Company to lend the entire $6,250,000.00 for 15 years, at 4½%, provided that it received additional compensation consisting of warrants granting it the right to acquire 10% of Monarch's stock for $17.50 per share within ten years. (Exhibit 2).

6. The Northwestern proposal was accepted by the Monarch Cement Company (Exhibit 3), and the transaction was completed effective May 10, 1956. (Stipulations, P.T.O. Dkt. 33; Exhibit 4).

7. The price at which plaintiff's stock was being traded at the time of the agreement was approximately $11.00 per share.

8. Warrants attached to the notes could not be exercised or transferred for three years, and expired after 10 years. The warrants were for the acquisition of unregistered stock in Monarch, and neither the warrants, nor the underlying stock could be transferred by Northwestern Mutual Life

Insurance Company, without giving plaintiff the right of first refusal.

9. On June 6, 1956, at the request of Northwestern Mutual Life Insurance Company, the Eberstadt Company valued the warrants, in the aggregate, at approximately $15,000.00. This valuation was based upon Eberstadt's opinion that the value of Monarch stock was approximately $17.50 per share, as of May 31, 1956. (Exhibit 12).

Monarch Cement Company had no knowledge of, or participation in, the Eberstadt valuation, which, from other evidence, appears to have been provided by Eberstadt for the purpose of establishing a low book value on the warrants, for purposes of Northwestern's income tax liability. (Loud deposition, pp. 33, 35).

10. The Court finds, as a matter of fact, that the figure of $15,000 did not represent the true value of the warrants at the time of the loan transaction.

11. In December, 1958, approximately 2½ years after the note and warrants were issued, the warrants were valued by Northwestern at $1,000,000 to $1,500,000 and valued by the Eberstadt representative, Nelson Loud, at $650,000 to $750,000. (Exhibits 13, 14; Loud deposition, p. 43, pp. 121–122).

12. In September, 1959, Northwestern agreed to accept $600,000 for the warrants, but plaintiff was unable to pay this sum due to its current financial condition. (Exhibit 5, pp. 2, 3, 4, 5).

13. On April 19, 1962, plaintiff purchased the warrants from Northwestern for the sum of $650,000 (Stip. D, P.T.O.; Exhibit 15). At this time there was no established market for plaintiff's stock, which was not listed on any exchange. Plaintiff had no warrants outstanding other than those issued to Northwestern.

14. Plaintiff made all required payments of interest and principal on the note to Northwestern, and the notes were retired when due in May, 1971. (Stip. B, P.T.O.; Exhibit 6).

15. Northwestern originally reported $14,964.13 of the warrant purchase price as interest, and the balance of $635,035.87, as capital gain on its federal income tax returns. Upon audit, the IRS required Northwestern to report the entire $650,000 purchase price as interest income. (Exhibit 24, attached, Wilmeth deposition).

16. Effective December 23, 1968, defendant authorized, pursuant to Regulations 1.163–3, amortization of discounts incurred on corporation obligations. Plaintiff amortized and deducted the warrant purchase price over years ending December 31, 1968 through 1971. These deductions were disallowed by defendant and plaintiff paid the additional tax and interest, unsuccessfully pursued administrative remedies, and then filed this action. (P.T.O. Stip. G; Refund claims, Exhibit 28).

17. Under the evidence presented by expert witnesses, the Court finds that plaintiff's notes would have required a yield of at least 6% to have been marketed in May, 1956, without the warrants. (Testimony Dunn, Loud).

18. Plaintiff's warrants were an integral part of the Northwestern transaction, and the value of these warrants constituted a part of the cost of obtaining the loan.

19. The loan agreement between plaintiff and Northwestern constituted an investment unit, as described by Regulations, § 1.163–3(a)(2), effective December 23, 1968:

> . . . In the case of a bond issued by a corporation after December 31, 1954, as part of an investment unit consisting of an obligations and an option, the issue price of the bond is determined by allocating the amount received for the investment unit to the individual elements of the unit in the manner set forth in subdivision (ii)(a) of § 1.1232–3(b)(2). Discount with respect to bonds issued by a corporation as part of investment units consisting of obligations and options after December 31, 1954, and before December 24, 1968 . . . should be amortized starting with the first taxable year ending on or after December 24, 1968 over the remaining life of such bonds.

\* \* \* \* \* \*

(d) *Definition.* For purposes of this section, a debenture, note, certificate or other evidence of indebtedness issued by a corporation and bearing interest shall be given the same treatment as a bond.

20. In establishing the value of plaintiff's warrants, the Court looks to Regulations § 1.1232–3(b)(2)(a)(ii) which requires proof of the yield which would have been required for plaintiff to market its $6,250,-000.00 note without the warrants. The Regulations provide in pertinent part that:

. . . The initial offering price of an investment unit consisting of an obligation and option shall be allocated to the individual elements of the unit on the basis of their respective fair market values. However, if the fair market value of the opinion is not readily ascertainable . . . then the portion of the initial offering price or price paid by the first buyer of the unit which is allocable to the obligation issued as part of such unit shall be ascertained as of the time of acquisition of such unit by reference to the assumed price at which such obligation would have been issued had it been issued apart from such unit. The assumed price of the obligation shall be ascertained by comparison to the yields at which obligations of a similar character which are not issued as part of an investment unit are sold in arm's length transactions, and by adjusting the price of the obligation in question to this yield . . . Any reasonable method may be used in selecting an obligation for comparative purposes. Obligations of the same grade and classification shall be used to the extent possible, and proper regard shall be given, with respect to both the obligation in question and the comparative obligation, to the solvency of the issuer, the nature of the issuer's trade or business, the presence and nature of security for the obligation, the geographic area in which the loan is made, and all other factors relevant to the circumstances.

## CONCLUSIONS OF LAW

1. Jurisdiction exists in this Court by virtue of 28 U.S.C. § 1346(a) and Exhibit 28, which the parties have stipulated is representative of plaintiff's refund claims for the four years in question.

2. Venue in this District is appropriate by virtue of 28 U.S.C. § 1402(a)(1).

3. Plaintiff's warrants were an integral part of the Northwestern transaction, and a part of the cost of obtaining the loan.

4. The loan agreement between plaintiff and Northwestern constituted an investment unit within the meaning of Regulations § 1.163–3(a)(2), (d).

5. Under all of the circumstances prevailing at the time of the Northwestern transaction, and under Regulations § 1.1232–3(b)(2)(a)(ii), the Court concludes that plaintiff would have been required to pay interest of at least 6% in order to market its notes in 1956 without the warrants.

6. Plaintiff is entitled to deduct the cumulative cost of such additional interest (the difference being 1½%) for the life of the notes, amortized over the years 1968, 1969, 1970, and 1971.

7. Since the parties have stipulated that they will compute the amount of any refund and interest due to plaintiff, the Court determines only the interest rate which would have been required for plaintiff to market its notes in 1956.

8. Plaintiff contends that it is entitled to attorney fees pursuant to 42 U.S.C. § 1988, which provides in pertinent part that:

. . . in any civil action or proceeding by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or Title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

9. Plaintiff's claim for attorney fees is denied, for the reason that this action is not a civil action or proceeding "by or on behalf

of" the United States within the meaning of 42 U.S.C. § 1988.

Pursuant to the foregoing findings and conclusions, and in accordance with the Stipulation of the parties entered February 14, 1978 (Dkt. 36),

IT IS ORDERED that the Internal Revenue Service shall compute the amount of refund due the plaintiff in accordance with the Court's findings, and the defendant United States of America shall submit these computations to counsel for plaintiff, along with a proposed form of judgment, and the parties shall thereafter submit such proposed judgment to the Court on or before the 15th day of August, 1978.

IT IS FURTHER ORDERED that in the event the parties are unable to agree upon the amount of the refund due the plaintiff, the parties, upon appropriate notice, shall submit their dispute to the Court for resolution.